# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| Jason Goldman, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>REALPAGE, INC.; BH MANAGEMENT SERVICES, LLC; CORTLAND PARTNERS, LLC; PINNACLE PROPERTY MANAGEMENT SERVICES, LLC; GREYSTAR REAL ESTATE PARTNERS, LLC; HIGHMARK RESIDENTIAL, LLC; INDEPENDENCE REALTY TRUST, INC.; LINCOLN PROPERTY CO.; MID-AMERICA APARTMENT COMMUNITIES, INC.; and MORGAN PROPERTIES MANAGEMENT COMPANY, LLC<br><br>        Defendants. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  Plaintiff Jason Goldman, individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and upon the investigation of counsel, brings this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on violations of federal antitrust laws and state law by Defendants RealPage, Inc. ("RealPage"); and BH Management Services, LLC; Cortland Partners, LLC; Pinnacle Property Management Services, LLC; Greystar Real Estate Partners, LLC; Highmark Residential, LLC; Independence Realty Trust, Inc.; Lincoln Property Co.; Mid-America Apartment Communities, Inc.; and Morgan Properties Management Company, LLC (collectively, the "Lessor Defendants," and together with RealPage, "Defendants").

# I.    INTRODUCTION

1.    From at least 2016, through the present, Defendants conspired to fix and inflate – and did, in fact, fix and inflate – the price of multifamily rental housing throughout the Greater Nashville Metro Area ("Nashville").[1]  Leveraging their control of the multifamily rental housing market during the Class Period, Defendants each caused substantial damages to Plaintiff and other Nashville renters, whose ability to obtain affordable housing depend on getting competitive prices for the units they rent.  Several witness accounts identified by Plaintiff's investigation, including nine discussed herein, alongside rental price and occupancy data, economic evidence, and public investigations,[2] confirm this anticompetitive conduct.

2.    Defendants are RealPage, the developer of an integrated technology platform that provides a host of software solutions for the multifamily rental housing markets, including revenue management software called "AI Revenue Management" (previously known as "YieldStar"),[3] and several managers of large-scale residential apartment buildings that used RealPage's property management software to coordinate and agree upon rental housing pricing and supply (the "Lessor Defendants").

---

[1]    As used throughout this Complaint, the Greater Nashville Metro Area is coterminous with the Nashville-Davidson – Murfreesboro – Franklin, TN Metropolitan Statistical Area, as established by the United States Office of Management and Budget.  Specifically, the Greater Nashville Metro Area consists of the Tennessee cities of Nashville, Davidson, Murfreesboro, Franklin, and their surrounding areas.  References to Nashville throughout this Complaint, unless specifically limited, refer to the Greater Nashville Metro Area.

[2]    Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why,* PROPUBLICA (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent (ProPublica report shedding light on Defendants' conspiracy and showing that rents in areas where RealPage clients control a high percentage of rental units have increased at a significantly higher rate).

[3]    RealPage's property management software solutions will be referred to collectively herein as "property management software."

3. Each Lessor Defendant agreed that: they would delegate their rental price and supply decisions to a common decision maker, RealPage; share the proprietary data necessary for RealPage to make those decisions; and, then abide by RealPage's price and supply decisions. As RealPage put it, it offered clients the ability to "outsource daily pricing and ongoing revenue oversight"[4] to RealPage, allowing Defendant RealPage to set prices for its clients' properties "as if we [RealPage] own them ourselves."[5]

4. Rather than function as separate economic entities, Lessor Defendants agreed to make key competitive decisions regarding the price and supply of multifamily apartments in Nashville collectively. As Emily Mask, an executive from property management company ECI Group explained, "*[W]e are all technically competitors . . . [but RealPage] helps us work together . . .* to make us all more successful in our pricing . . . [RealPage] is designed to work with a community in pricing strategies, not work separately . . . we rarely make any overrides to the [pricing] recommendations . . ."[6]

5. RealPage's clients provide RealPage with vast amounts of their non-public proprietary data, including their lease transactions, rent prices, and occupancy and inventory

---

[4] Press Release, RealPage, Inc., YieldStar Offers Revenue Advisory Services to Multifamily Owners and Managers (Mar. 1, 2010), https://www.realpage.com/news/yieldstar-offers-revenue-advisory-services-to-multifamily-owners-and-managers/.

[5] RealPage Renewal Reporting Presentation, MEDVE, https://medve.com/assets/airm-renewal-reporting.pdf (last accessed May 26, 2023).

[6] The RealPage e-book, PROVEN: B & C Assets Ace the Market with RealPage: How Two Companies Pushed Performance Over 3+% Above Market (2019) (hereinafter, "RealPage e-book B & C Assets Ace the Market") (detailing two case studies in which RealPage clients achieved revenue growth and outperformed the market after adopting RealPage's pricing recommendations. ECI Group achieved 5%-7% year-over-year revenue growth after adopting RealPage's pricing recommendations and BH Management saw a 4.8% "outperformance to the market," and 4% between its own properties using RealPage's pricing recommendations against those that had not yet adopted RealPage pricing.

levels. Each client's proprietary data is fed into a common data pool, along with additional data collected by Defendant RealPage's myriad other data-analytics and rental-management software products. RealPage then trains its machine learning and artificial intelligence across that pool of its clients' proprietary data and uses algorithms to generate rental prices for each of RealPage's client's available units daily. Property managers agree to adopt RealPage's pricing at least 80%-90% of the time, knowing that if they, alongside their co-conspirators, adhere to RealPage's pricing decisions, they will collectively raise market prices and avoid harmful price competition.[7]

6. To prevent their staff from exercising independent judgment when setting rents, Lessor Defendants and Defendant RealPage have established a rigorous monitoring and compliance system to ensure decision making on pricing remains with RealPage.

7. For example, Defendant RealPage assigns clients "Pricing Advisors"[8] to monitor the client's compliance with RealPage's pricing decisions, and to disseminate confidential and

---

[7] Moreover, witness accounts, discussed below, confirm that RealPage clients were aware that their proprietary information was being collected and pooled with that provided by their regional competitors and that RealPage's pricing algorithm made use of this data superset. Indeed, RealPage is transparent about its use of pooled data in its "Revenue Management FAQs," section, providing that in addition to a "variety of [other] sources, . . . competitor rent data is one of several data inputs" into the pricing algorithm. *Frequently Asked Questions About Revenue Management Software*, REALPAGE, Inc., https://www.realpage.com/asset-optimization/revenue-management/?utm_source=google&utm_medium=cpc&utm_campaign=Spear+-+HDDR+Revenue+Management+-+Search&utm_content=search&utm_adgroup=Revenue+Management&utm_device=c&utm_keyword=ai%20revenue%20management&gad=1&gclid=Cj0KCQjwmZejBhC_ARIsAGhCqndpmEtz_7CgdbVOuCLdRHSoZlU42vJD2ors4fYig6K9svH0xlSoJ9saAnadEALw_wcB&showPdf=true (last visited May 24, 2023).

[8] *RealPage AI Revenue Management,* REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/?utm_source=google&utm_medium=cpc&utm_campaign=Spear+-+HDDR+Revenue+Management+-+Search&utm_content=search&utm_adgroup=Revenue+Management&utm_device=c&utm_keyword=ai%20revenue%20management&gad=1&gclid=Cj0KCQjwmZejBhC_ARIsAGhCqndpmEtz_7CgdbVOuCLdRHSoZlU42vJD2ors4fYig6K9svH0xlSoJ9saAnadEALw_wcB (last visited May 17, 2023) (describing RealPage's Revenue Management Advisory services as providing "expert oversight of [clients'] pricing strategy").

commercially sensitive information provided to RealPage by the client's competitors to encourage compliance with RealPage's decisions. As RealPage put it to its property management clients, "[y]our Pricing Advisor is an extension of your team and empowered with the authority required for success."[9] Any client who attempts to diverge from RealPage's daily unit pricing must provide a justification to a Pricing Advisor and obtain their approval for the proposed deviation. RealPage accepts very few justifications for any requested override, routinely rejecting client claims that RealPage's prices were off-market or out-of-step with local property conditions. While RealPage claims that all pricing decisions are ultimately left to its clients, witnesses confirm that, in practice, no modifications to RealPage's recommended pricing can be made without RealPage's prior approval. As one leasing manager at a RealPage client (Witness 6) put it, "I knew [RealPage's prices] were way too high, but [RealPage] barely budged [when I requested a deviation]."

8. Aside from daily and weekly interactions, RealPage provides its clients with quarterly one-on-one "Performance to Market" meetings, designed to identify how compliant the client was with RealPage's pricing recommendations during the prior quarter, and quantify any purported revenue loss that RealPage attributed to the client's deviations from its pricing recommendations.

9. Property management companies' executives also placed pressure on their leasing managers to implement RealPage's prices. For example, Defendant Lincoln forced leasing managers wishing to deviate from RealPage's prices to submit a request to the corporate office. A former Lincoln Leasing Consultant in Nashville (Witness 4) recalls that these deviation requests were rejected almost 99% of the time, and that Lincoln corporate would reiterate that RealPage's

---

[9]     *AI Revenue Management*, THE MEDVE GROUP, INC., (June 21, 2021), https://medve.com/assets/airm-manager-training-medve-management-6.23.2021-(1).pdf.

"rates are what they are." Similarly, one former RealPage Pricing Advisor (Witness 5) recalls the agitation expressed by Christina Agra-Hughes, President of the property management company First Pointe Management Group, upon learning about her staff's deviation from Defendant RealPage's prices during a meeting with RealPage staff and asked rhetorically, "why the hell aren't my teams following the model!?" To help their clients discipline staff, RealPage rolled out a new version of its software in 2019, referred to internally as "Price Optimization 2" or "POV2." That update tracked not only a client's acceptance rate, but the identity of the client's staff that requested a deviation from RealPage's price. Additionally, to discourage any "temptation to override the [RealPage pricing] algorithm if rents appear too aggressive,"[10] compensation for certain property management personnel are tied to compliance with RealPage's pricing recommendations.

10. As the stated goal of RealPage's software is for its clients to "outperform the market [by] 3% to 7%,"[11] the inevitable outcome of Defendants' coordinated price setting was that rents have been pushed above competitive levels. Figure 1 below shows the steady increase in rental prices in Nashville, as more and more property managers adopted RealPage:

---

[10] Paul R. Bergeron III, *Revenue Management: Why It Works*, NAT'L APARTMENT ASS'N (July 30, 2015; updated Oct. 27, 2016), https://www.naahq.org/revenue-management-why-it-works.

[11] Vogell, *supra*, note 2 (citing RealPage website, "YieldStar Predicts Market Impact Down To Unit Type and Street Location, *available at* https://www.realpage.com/videos/yieldstar-data-scientists-help-manage-supply-demand/)).

**Figure 1: Average Rents in Nashville, Tennessee 2015-2023**



11.     RealPage and the Lessor Defendants admit the impact of Defendant RealPage on rental prices.  After praising a 14% increase in average rental prices across 2021 at an industry event, RealPage Vice President Jay Parsons asked Andrew Bowen, RealPage's then Vice President of Investor Markets, what role he thought RealPage had played in the unprecedented increase.  "I think it's driving it, quite honestly," Bowen replied.[12]

12.     Individuals who previously worked for RealPage and its clients also confirm that rental prices were artificially raised.  For example, one leasing manager (Witness 6) reported that, in 2021, the first year the property she worked at employed RealPage to set rents, rents on the

---

[12]     Vogell, *supra*, note 2.

building's standard two-bedroom units were raised from $1,650 to $2,100, an increase of approximately 27%, despite no improvements made to the units. Another former FPI Management[13] community director (Witness 9), reported that RealPage's pricing software resulted in the rental price of unrenovated apartments rising by 8%-10%. Witness 6, who also worked with RealPage in connection with her role as a Leasing Consultant with Defendant Greystar, "completely agrees" that rental prices in her region were artificially inflated upon the adoption of RealPage pricing recommendations.

13. Aside from raising rents, Defendants' collective delegation of their decision-making authority to Defendant RealPage also raised vacancy rates and impacted the supply of multifamily apartments.

14. Vacancy rates rose because each Lessor Defendant could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties. This behavior is only rational if Lessor Defendants know that their competitors are setting Nashville rental prices using the same algorithm and thus would not attempt to undercut them.

15. This was a departure from prior practice. Before the introduction of coordinated rent-setting software, residential property managers independently set prices, and generally did so to maximize occupancy. If supply was high, market prices would drop, and allowing apartments to stand vacant at their advertised rental prices made little sense when similar apartments in the

---

[13]     FPI Management Inc., is named as a Defendant in 26 cases filed in this Action, including in six complaints filed by Regional Plaintiffs in *Boelens v. RealPage, Inc.*, 2:22-cv-01802 (W.D. Wash.); *Corradino v. RealPage, Inc.*, 1:23-cv-20165 (S.D. Fla.); *Enders v. RealPage, Inc.*,1:23-cv-00055 (D. Colo.); *Mackie v. RealPage, Inc.*, 1:23-cv-00011 (D. Colo.); *Parker v. RealPage, Inc.*, 1:23-cv-20160 (S.D. Fla.); and *Weaver v. RealPage, Inc.*, 1:22-cv-03224 (D. Colo.). On information and belief, FPI Management does not manage any properties in the Greater Nashville Metro Area and is, therefore, excluded as a Defendant in the instant matter.

area were available for less.  Thus, in the past, Nashville property managers had an incentive to lower rents until all available units were occupied.

16.     Defendant RealPage has not been shy about its desire to raise vacancy rates.  During a 2017 earnings call, then-CEO of RealPage, Steve Winn, described how one large client, managing over 40,000 units, drastically increased its profit by operating at a vacancy rate that "would have made [that property manager's] management uncomfortable before."[14]  The client had previously targeted 97% or 98% occupancy rates in markets where it was a leader.  After outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate (*i.e.*, 5% vacancy rate).[15]

17.     The impact of the Lessor Defendants' shift from a "heads in beds" strategy to RealPage's revenue maximization strategy is apparent from comparing Nashville's average rental and vacancy rates.  Within Nashville, **both** rents **and** vacancy rates trended higher from 2014-2020,[16] demonstrating that the forces of supply and demand no longer control the price of rent in the Greater Nashville Metro Area:

---

[14]     Vogell, *supra*, note 2.

[15]     *Id*.

[16]     Due to conditions caused by the COVID-19 pandemic that will take years to unwind (including generally slowed construction of new apartment units and restrictions on the availability of evictions), current vacancy numbers do not accurately reflect market forces.

**Figure 2: Rent vs. Occupancy in the Greater Nashville Metro Area**



18.     Figure 2, is also consistent with the preliminary regression analysis of rental prices in other rental markets that share certain common characteristics with Nashville, including percentage of units occupied by renters.  That analysis suggests the expected negative relationship between rental prices and vacancy (*i.e.*, that an increase in vacancies would cause a decrease in rental prices), was severed at or around the beginning of the class period, with the result that rental prices continued to climb notwithstanding a consequent increase in vacancies.  *See* §F, below.

19.     Defendants also worked together to avoid periods of oversupply that might detrimentally impact rental prices.  Using its record of its clients' lease expirations and housing inventory, Defendant RealPage's daily pricing recommendations are accompanied with suggested lease terms that are staggered to avoid temporary periods of oversupply resulting from the natural

ebb and flow of the market.[17]  Collectively manipulating supply to minimize naturally-occurring periods of oversupply removes a source of periodic downward price pressure on rents, which is the strongest during these temporary oversupply periods.

20.     Not content to limit their conspiracy through indirect contact via RealPage, the Lessor Defendants also pursued direct contacts amongst themselves to facilitate information exchanges and coordinate prices.  RealPage hosts online forums, organizes in-person events for its clients,[18] and maintains standing committees of cartel members – including the 1,000 member strong User Group – to advise on pricing strategy.[19]  RealPage hosted webinars, screen sharing training modules, frequent calls, in-person "roundtables," and annual conferences in efforts to combine forces with the largest property management companies in the United States and align on

---

[17]     Revenue Management: Proven in Any Market Cycle: See How These Top Companies Outperformed During Downturns (2020), https://www.realpage.com/ebooks/outperform-in-a-down-market/ (hereinafter, "Revenue Management: Proven in Any Market Cycle") (" . . . identifying the excess supply period and time horizon will allow [property managers] to strategize which lease terms will allow expirations to be minimized during the excess supply time horizon, therefore reducing the number of expirations and potential [revenue] exposure [property managers] will experience during this excess supply time").

[18]     *See* Susan Gaide, *Real World 2022 Customer Conference Recap*, REALPAGE, INC., (July 29, 2022), https://www.realpage.com/blog/realworld-2022-customer-conference-recap/ (last visited May 17, 2023) (three-day conference hosted by RealPage in Las Vegas with over 1,500 industry attendees, including keynote speakers, "Lynne Ann Chase, Chief Accounting Officer for Winn Residential (the ninth largest apartment manager in the country with more than 103,000 units under management across affordable housing, military housing and conventional), Yetta Tropper, Head of Multifamily Asset Manager for PGIM (the real estate investment arm of Prudential) and Scott Pechersky, Chief Technology Officer for RPM Living (#7 on the NMHC manager list with more than 112,000 units.")).

[19]     *User Group Overview*, REALPAGE, INC., https://www.realpage.com/user-group/overview/ (last visited May 17, 2023) (hereinafter, "User Group Overview") (formed in 2003, the User Group "is the organization by RealPage to improve communications between RealPage and the user community, and to promote communications between users."

price-setting methods in the multifamily rental housing market.[20]  RealPage would use these events to explain the many financial benefits of working together instead of as competitors.  According to James M. Nelson, the researcher whose work sparked the ProPublica report regarding RealPage rental software, "the cartel [took] root in these various summits."

21.     RealPage also encourages its clients to communicate directly with one another to exchange pricing information.  In training materials that RealPage provides to clients, in a section addressing how property managers should answer initial pricing inquiries titled "Overcoming Objections Guide," RealPage gives the following "Protips" on how its clients can obtain confidential, competitively sensitive information directly from one another:

**Figure 3:  Excerpt from RealPage's Overcoming Objections Guide**



**Protips**

·Shop your competitors over the phone, in-person, and view their websites. Be knowledgeable about their pricing, specials, and product
·Utilize a calendar to narrow down a lease start date
·Utilize a calculator to compute their savings

22.     After ProPublica's reporting brought Defendants' misconduct to light, multiple members of Congress have urged the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") to investigate the collusion facilitated by the collection and use of rent data input and exchanged through RealPage's revenue management software.  While the DOJ has yet

---

[20]     Since 2000, every year the executive-level users of RealPage convene for a three-day conference called the "RealWorld User Conference" ("RealWorld").  *See Realpage Sets Stage in Vegas for 11th Annual Realworld User Conference*, REALPAGE NEWS Mar. 14, 2011, https://www.realpage.com/news/realpage-sets-stage-in-vegas-for-11th-annual-realworld-user-conference/; *See also* Chris Wood, New Expectations *in* Multifamily Technology *ROI*: Q&A With RealPage's Steve Winn, MULTIFAMILY EXECUTIVE (July 15, 2009),   https://www.multifamilyexecutive.com/technology/new-expectations-in-multifamily-technology-roi-q-a-with-realpages-steve-winn_o.

to announce any formal investigation into RealPage, it has announced that it will hold an expert workshop "to inform potential guidance updates around anticompetitive information sharing" in consumer facing markets, including the multifamily rental housing market.[21]

23.    Defendants' price-fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act.  It has resulted in artificially inflated rent prices and a diminished supply of rental units in the Greater Nashville Metro Area.  Plaintiff and the Class, who rent in the Greater Nashville Metro Area from property managers that use Defendant RealPage's software, paid significant overcharges on rent and suffered harm from the reduced availability of rental units they could reasonably afford.  This suit is brought to recover for that harm.

## II.    JURISDICTION AND VENUE

24.    Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1).

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a), 26).

26.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22, and 26), and pursuant to 28 U.S.C. §1391(b), (c), and (d), because, at all relevant times, one or more of the Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

---

[21]    Chris May, US DOJ to Support FTC, CFPB push against rent prices with guidance on anticompetitive information sharing, MLEX (Jan. 25, 2023), https://content.mlex.com/#/content/1445159.

27.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) leased residential units to individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

28.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

29.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.     THE PARTIES

30.     Plaintiff Jason Goldman is a resident of Nashville, Tennessee.  Mr. Goldman rented a residential unit in a property known as Lincoya Bay Townhomes in Nashville, Tennessee from April 2021 through the present.  During that time, Defendant Morgan Properties Management Company, LLC ("Morgan") managed the property using Defendant RealPage's software and Morgan imposed on Mr. Goldman two rent increases on or around November 15, 2021, and November 15, 2022, representing a 4.6% increase, and nearly a 10% increase, year-over-year. Consequently, Jason Goldman paid higher rental prices by reason of the violations alleged herein.

31.     Defendant RealPage is a corporation headquartered in Richardson, Texas, organized and existing under the laws of Delaware.  RealPage provides software and services to managers of residential rental apartments, including the YieldStar/AI Revenue Management software described herein.  RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm Thoma Bravo, LP, in a transaction that

valued RealPage at approximately $10.2 billion.[22] At that time, RealPage had over 31,700 clients, including each of the 10 largest multifamily property management companies in the U.S.[23]

32.     Defendant BH Management Services, LLC ("BH") is a limited liability company headquartered in Des Moines, Iowa, organized and existing under the laws of Iowa. BH manages over 106,000 apartments nationally, including approximately six properties in the Greater Nashville Metro Area.

33.     Defendant Cortland Partners, LLC ("Cortland") is a limited liability company headquartered in Atlanta, Georgia, organized and existing under the laws of Georgia. Cortland manages over 58,000 apartments nationally, including approximately three properties in the Greater Nashville Metro Area.

34.     Defendant Pinnacle Property Management Services, LLC ("Pinnacle") is a Delaware limited liability corporation headquartered in Addison, Texas. Pinnacle is a residential apartment manager with approximately 11 properties in the Greater Nashville Metro Area.

35.     Defendant Greystar Real Estate Partners, LLC ("Greystar") is a limited liability company headquartered in Charleston, South Carolina, organized and existing under the laws of Delaware. Greystar is by far the largest manager of residential rental apartments in the country, with over 698,000 units under its management, including approximately 21 properties in the Greater Nashville Metro Area.

36.     Defendant Highmark Residential, LLC ("Highmark") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Highmark is

---

[22]     Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/.

[23]     RealPage Inc., 2020 Annual Report (Form 10-K) at 6 (Mar. 1, 2021), (hereinafter, "RealPage 2020 Form 10-K").

a residential apartment manager with approximately 11 properties in the Greater Nashville Metro Area.

37. Defendant Independence Realty Trust, Inc. ("IRT") is a real estate investment trust headquartered in Philadelphia, Pennsylvania, organized and existing under the laws of Maryland. IRT is a residential apartment manager with over 36,000 rental units under its management, including approximately 10 properties in the Greater Nashville Metro area.

38. Defendant Lincoln Property Company ("Lincoln") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas. Lincoln is a residential apartment manager with over 210,000 rental units under its management, including approximately 19 properties in the Greater Nashville Metro Area.

39. Defendant Mid-America Apartment Communities, Inc. ("MAA") is a corporation headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee. MAA is a residential apartment manager with over 100,000 rental units under its management, including approximately 12 properties in the Greater Nashville Metro Area.

40. Defendant Morgan is a Delaware limited liability company headquartered in King of Prussia, Pennsylvania. Morgan is the eleventh largest property manager of multifamily rental properties in the United States, with over 96,000 multifamily housing units under management across 20 states, including five properties in the Greater Nashville Metro area.

41. Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

42.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs. Each of the Defendants named herein acted as the agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

43.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.     FACTUAL ALLEGATIONS

### A.     Historical Competition Among Residential Property Managers

44.     Before the adoption of RealPage's software suite, competition in the multifamily rental housing market was driven by property managers' desire to keep "heads in beds" – in other words, maintain the highest possible occupancy levels and keep turnover among tenants to a minimum.[24] Property managers' adherence to the "heads in beds" strategy signaled the market was operating competitively.

45.     That "heads in beds" is the prevailing competitive response is easy to intuit. Not only do vacant apartments lead to lost rental income, but it also saves the property manager almost no marginal cost because the costs of owning and maintaining a rental apartment are not significantly different whether the unit is occupied or not. This provides a strong incentive for property managers to lower their rents to fill vacant units. While property managers knew in theory that if they all resisted this temptation, they would all benefit from higher average rents, any individual property manager that lowered its rents to fill vacancies while the others did not would

---

[24]     Vogell, *supra*, note 2.

be able to gain market share at the others' expense and achieve lower vacancy rates, higher revenues, and higher profits.

46.     As Donald Davidoff, the principal developer of the competing price-setting software that Defendant RealPage acquired in 2017, Lease Rent Options, explained in a 2020 blog post:

> All [property managers] would be better off limiting their rent reductions; however, should one property manager lower their rents while the others don't, then that operator would outperform.  The result can be a race to the bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting collusion make this the most likely outcome.[25]

This so-called "race to the bottom" might be bad for all property managers but is, of course, good for renters and what the law demands.  It represents nothing beyond healthy price competition.

47.     Absent collusion, property managers could not unilaterally raise rents above market rates – any property manager that did so would lose tenants to its competitors who offered rental units at market rates, granting those competitors a higher share of the available profits.  This dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand.  For example, rents have historically gone up quickly in neighborhoods that become trendy or when new public transportation infrastructure is added, and have fallen in areas where businesses close or that new generations find less desirable than previous ones did.  Any number of factors that made people want to live in a certain area or a certain type of apartment could cause rents to rise or fall accordingly.  Rents were also historically responsive to changes in renters' average income.

48.     As described more fully below, Defendants' conspiracy avoids the competition-driven race to the bottom.  As Donald Davidoff explained, "[n]ow, rent growth and occupancy are

---

[25]     Donald Davidoff, *They're Heckling Revenue Management Again*, THE DEMAND SOLUTIONS BLOG (Aug. 18, 2020), https://www.d2demand.com/mfhblog/theyre-heckling-revenue-management-again.

co-equals."[26]  David Romano, the vice president of pricing and revenue management at Equity Residential, one of the largest publicly traded apartment owners in the United States is quoted in a New York Times article dated, November 29, 2011, as saying, "[w]e don't have occupancy targets per se.  We let the system determine at what rate revenue is maximized at a given occupancy level."[27]

49.    The "system" does so, however, at the financial expense of renters – Plaintiff and the Class – who are the victims of a one-way ratchet.  Property managers hike rents at a faster pace when demand is strong, without needing to lower them when it is weak.  With competition between property managers reduced or eliminated, renters are forced to spend higher and higher portions of their incomes on housing.

## B.    Evolution of RealPage's AI Revenue Management System

50.    Defendant RealPage provides a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry."[28]  Its clients are managers of residential rental apartments, to which it offers an array of products for: (1) marketing and leasing of apartments; (2) resident experience (including IT portals and rent payment software); (3) site management; (4) vendor and expense management; (5) budgeting and investment; (6) accounting; (7) data analytics; and (8) so-called "revenue management" – advisory services on how to obtain higher rents on every unit.  While other products facilitate gathering

---

[26]    Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a Revolution*, MULTIFAMILY EXECUTIVE (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o (last May 29, 2023).

[27]    Matt Hudgins, New York Times, "When Apartment Rents Climb, Landlords Can Say 'The Computer Did It,'" *nytimes.com*, Nov. 29, 2011, https://www.nytimes.com/2011/11/30/realestate/commercial/landlords-use-computers-to-arrive-at-the-right-rental-fee.html

[28]    RealPage 2020 Form 10-K, *supra*, note 23, at 6.

Lessor Defendants' confidential competitive information, RealPage's "revenue management" service is the linchpin of Defendants' anticompetitive scheme.

51.    RealPage was founded in 1998.  In 2002, it acquired the original YieldStar software from Camden Property Trust ("Camden").[29]  Two years later in 2004, the company hired Jeffrey Roper as its principal scientist to improve YieldStar's performance and grow its client base.[30]  Roper saw that RealPage's customers could use that software to drive higher average rents, but in order to do so, RealPage needed huge amounts of detailed data regarding rent prices and occupancy of individual units across many properties.[31]  RealPage began collating data from its clients and other sources in a "data warehouse," for the algorithms that now power Defendant RealPage's "revenue management" software to train on.  Beyond rent prices and occupancy rates, RealPage collected records of actual lease transactions, signed lease documents, lease renewal dates, records of rent payments, and detailed data on tenants and their finances.

52.    RealPage's increased access to data, coupled with advances in machine learning and artificial intelligence technology used to synthesize and analyze large pools of data, led Roper to design a pricing and lease term algorithm for the multifamily rental industry.  This algorithm built upon the price-setting software that Roper designed for Alaska Airlines, who was accused by

---

[29]    Press Release, RealPage, Inc., RealPage Acquires YieldStar Multifamily Revenue Management System (July 19, 2002), https://www.realpage.com/news/realpage-acquires-yieldstar-multifamily-revenue-management-system/.

       Camden is currently named as a Defendant in 23 active, related cases, including in nine actions filed by Regional Plaintiffs in *Bertlshofer v. RealPage, Inc*., 2:23-cv-00018 (D. Ariz.); *Carter v. RealPage, Inc*., 1:22-cv-01332 (W.D. Tex.); *Corradino v. RealPage, Inc*., 1:23-cv-20165 (S.D. Fla.); *Enders v. RealPage, Inc*., 1:23-cv-00055 (D. Colo.); *Kramer v. RealPage, Inc*., 1:22-cv-03835 (D. D.C.); *Mackie v. RealPage, Inc*., 1:23-cv-00011 (D. Colo.); *Parker v. RealPage, Inc*., 1:23-cv-20160 (S.D. Fla.); *Vincin v. RealPage, Inc*., 1:22-cv-01329 (W.D. Tex.); and *Weaver v. RealPage, Inc*., 1:22-cv-03224 (D. Colo.).

[30]    *See* Vogell, *supra*, note 2.

[31]    See *id*.

the DOJ of illegally facilitating information exchange and price-fixing between 1988-1992.[32] Indeed, RealPage is unreserved about the origins of its revenue management system, acknowledging on its website that "[t]he technology is similar to revenue management approaches that were originally adopted by the airline industry . . ."[33] During Roper's tenure as director of revenue management at Alaska Airlines – 1986-1991 – Alaska Airlines and its competitor airlines began using common software, designed by Roper, to exchange information regarding planned routes and ticket prices before that information became public.[34] Roper's software allowed the airlines using it to avoid price competition that would have lowered ticket prices. The DOJ's Antitrust Division filed suit against eight of the largest U.S. airlines, alleging that Roper's software-enabled information exchange amounted to anticompetitive price fixing under the antitrust laws.[35] A government economist calculated that the scheme cost consumers up to $1.9 billion.[36] All eight airlines eventually entered into consent decrees requiring them to eliminate the information exchange features of the software that had enabled the conspiracy.[37] At one point

---

[32] Press Release, U.S. Dep't of Just., Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/ press_releases/1994/211786.htm. (hereinafter, "DOJ Press Release, Mar. 17, 1994").

[33] *Frequently Asked Questions About Revenue Management Software*, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/?showPdf=true (last accessed May 30, 2023) (hereinafter, "RealPage Revenue Management FAQs").

[34] Vogell, *supra* note 2.

[35] Press Release, U.S. Dep't of Just., Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/ press_releases/1992/211323.htm.

[36] DOJ Press Release, Mar. 17, 1994, *supra* note 32.

[37] *Id.*

during the investigation, federal agents removed a computer and documents from Roper's office at Alaska Airlines.[38]

53. Much like the airlines' price-fixing cartel, Defendants' cartel eliminates price competition and the "race to the bottom" during periods of oversupply. As Defendant RealPage declared to potential clients in its 2020 advertising materials: "You don't have to sacrifice rent growth during a softening market."[39]

54. Defendants' efforts to raise rents in concert through RealPage's software became more and more effective as more property managers implemented it, and it was able to take information from more market participants into account. A former RealPage Vice President ("Witness 1") explained that while initially many companies that utilized RealPage's pricing software did so to avoid undervaluing rental properties, as the RealPage pricing platform became more sophisticated and gained user confidence and additional data inputs, it was used less as an advisory product and more as a rent-setting software.[40]

55. Defendant RealPage became the primary price-setting vendor to the multifamily housing rental software market through acquisitions of its competitors. RealPage began buying up similar and competing software companies, and it has completed 26 acquisitions since its founding.[41] Indeed, one former RealPage Strategic Account Analyst ("Witness 2") recalled that during her tenure, it seemed like RealPage "was acquiring businesses on a bi-weekly basis," intent

---

[38] Vogell, *supra* note 2.

[39] Revenue Management: Proven in Any Market Cycle, s*upra*, note 17.

[40] Witness 1 was a RealPage Vice President from 2014-2018, based in Dallas, Texas. In that role Witness 1 was responsible for product and business development. In particular, Witness 1 was responsible for implementing ongoing enhancements, expansions, and changes, according to user feedback for RealPage products already in-market. Witness 1 was also charged with pursuing strategic opportunities and cultivating business partnerships for these same products.

[41] Bloomberg Company Report, RealPage, Inc. (generated Nov. 1, 2022).

on becoming "the largest multifamily real estate software provider in the world."[42]  According to

its 2021 S-1 filing with the Securities and Exchange Commission ("SEC"), RealPage

acknowledged "As part of our strategy, we plan to continue to pursue acquisitions of

complementary businesses, products, and technologies."[43]

56.    The most important of these transactions came in 2017, when RealPage acquired

Lease Rent Options ("LRO"), RealPage's strongest rival.  The acquisition included LRO's

revenue-management software, which RealPage rebranded as AI Revenue Management.  LRO's

software was not the most valuable piece of the acquisition for Defendant RealPage, however –

LRO's customer base was.  At the time of the merger, RealPage was pricing 1.5 million units.

That number doubled with the acquisition.[44]

57.    While the DOJ issued a "Second Request" in connection with the proposed merger

due to its potential effects on competition, the DOJ took no further action, and RealPage completed

the acquisition.[45]  Even Jeffrey Roper, RealPage's principal data scientist exclaimed, "I was

surprised the DOJ let that go through."[46]

58.    Witness 1 explained that after its acquisition of LRO, RealPage "effectively had a

monopoly."  At this point, Witness 1 stated that property managers' adoption of RealPage's

software would affect price over the entire market, including "small mom and pop shops" who are

---

[42]    From 2020 through 2022, Witness 2's responsibilities included reaching out to current and former RealPage clients to identify other needs that could be satisfied with one of RealPage's more than 100 and growing, software offerings.  Given her role at RealPage, Witness 2 was required to remain apprised of all RealPage offerings, which was ever-changing as the result of its ongoing acquisitions.

[43]    RealPage 2020 Form 10-K, *supra* note 23.

[44]    Vogell, *supra* note 2.

[45]    *Id.*

[46]    *Id.*

not using RealPage's revenue management software. Witness 1 explained that when these "mom and pop shops" price their own units, they rely on competitors' pricing when looking at comparable rental units in the region. In doing so, these small landlords often compare their prices to publicly posted pricing of other buildings, including those that follow RealPage's pricing recommendations. Witness 1 characterized this as creating a "feedback control loop," that was exacerbated by the "very incestuous" nature of the multifamily property management industry.

59.     Similarly, a former RealPage Customer Success Manager ("Witness 3") based in Richardson, Texas stated that "everyone in Texas" used RealPage pricing software and "RealPage runs the monopoly around Texas for setting rent prices."[47]

60.     RealPage's control over multifamily rental prices continued to grow after its acquisition of LRO. By the end of 2022, RealPage claimed that AI Revenue Management set the price for more than four million rental units.[48] These four million units, however, provide only a portion of the data available to train Defendant RealPage's algorithm. RealPage is also able to mine data from property managers that rely on RealPage software other than AI Revenue Management.[49] According to RealPage's last annual report before being acquired by Thoma Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or more of [its]

---

[47]     Witness 3 worked as a RealPage Customer Success Manager in Richardson, Texas from 2017 through 2019, during which he was responsible for interfacing with various RealPage property management clients to ensure their subscribed RealPage products were working properly, including RealPage's Revenue Management software.

[48]     *RealPage AI Revenue Management*, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/(last accessed May 26, 2023).

[49]     Witness 3 explained that RealPage discouraged "a la carte" product offerings and encouraged salespeople to offer existing and potential customers the full RealPage "product suite," including AI Revenue Management. Witness 3 learned of this "push" by RealPage soon after he began working there and consequently, whenever one of his clients had a product renewal approaching, Witness 3 encouraged the client to subscribe to all RealPage software offerings for the multifamily rental housing market.

integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[50]

61.     RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents – data which was previously unavailable to landlords.   Witness 1 confirmed that RealPage collects data on "everything they can."   With this data, Defendant RealPage is able to calculate and disseminate supracompetitive unit-by-unit pricing on a daily basis for use by the Lessor Defendants, touting that its algorithm "crunches ***millions of transactions each night***, pinpointing price shifts for ***every single unit*** on the platform at any point in time."[51]

62.     Figure 4, below, is a diagram from an eBook published by Defendant RealPage on its website.[52]   It demonstrates how RealPage aggregates the data (including nonpublic lease transaction data) that enables RealPage to coordinate pricing among its clients.

**Figure 4: Excerpt from RealPage e-Book "3 Ways to Leverage AI for Maximum NOI"**



How Quality Data Is Processed to Produce Powerful AI

## C. Property Management Companies Effectively Outsourced Pricing and Supply Decisions to RealPage, Eliminating Competition

63. RealPage clients, including the Lessor Defendants, provide RealPage with detailed, real-time, and non-public information concerning pricing, inventory, occupancy rates, as well as their units and unit types available, or that will soon be available for rent. The Lessor Defendants share this proprietary data knowing that RealPage will use it to assist them and their competitors, including through price and lease term recommendations. Lessor Defendants also share this proprietary data with Defendant RealPage so that they can benefit from the proprietary data their competitors are likewise providing RealPage. As Witness 1 phrased it, "how are you going to get comps [pricing comparisons from your competitors] if you're not participating?"

64. The U.S. Department of Justice has stated that the exchange of the kind of information the Lessor Defendants agree to exchange with their direct competitors raises serious antitrust concerns:

> . . . the sharing of information related to a market in which . . . the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive information.[53]

65. Not content to merely facilitate this anticompetitive information exchange, RealPage largely requires its clients to "outsource [their] daily pricing and ongoing revenue

---

[53] US DOJ and FTC, Antitrust Guidelines for Collaboration Among Competitors (April 2000) at 15, https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

oversight" to RealPage. [54]  RealPage then prices each client's multifamily rental "properties as if we [RealPage] own them ourselves,"[55] with the benefit of RealPage's access to each competitor's past, current, and future pricing and leasing decisions.

66.     Following RealPage's entry into the market, the Lessor Defendants all concertedly shifted from prioritizing occupancy (*i.e.*, market share) over price, to prioritizing price over occupancy – a telltale sign of anticompetitive coordination.

67.     By enabling property managers to outsource lease pricing decisions to the software, Defendant RealPage has corrupted rental markets, replacing independent centers of decision making with a single effective decisionmaker – RealPage.  Indeed, Witness 2 explained that RealPage's Revenue Management was pitched to clients as a learning system that would analyze comparable properties and set prices that multifamily real estate owners and operators "wouldn't have to mess with."  Moreover, Witness 2 explained that RealPage's pricing recommendation software was pitched as saving owners and operators of multifamily residential rental properties the time from "having to do their own research."

68.     A former Leasing Consultant and Assistant Property Manager for two properties managed by Defendant Lincoln in the Greater Nashville Metro Area ("Witness 4")[56] explained that rental rates in Lincoln's new leases were auto-populated by RealPage's pricing platform.

---

[54]     Press Release, RealPage, Inc., YieldStar Offers Revenue Management Advisory Services to Multifamily Owners and Managers (March 1, 2010), https://www.realpage.com/news/yieldstar-offers-revenue-advisory-services-to-multifamily-owners-and-managers/.

[55]     RealPage Renewal Reporting Presentation, *supra*, note 5.

[56]     From 2017 through 2018, Witness 4 worked as a Leasing Consultant at a property located in the Greater Nashville Metro Area and managed by Defendant Lincoln.  Subsequently, from 2019 until 2020, Witness 4 worked as an Assistant Property Manager at another property in the Greater Nashville Metro Area managed by Defendant Lincoln.  In both these roles, Witness 4 checked RealPage's pricing recommendations daily. However, he was unable to change or offer different pricing terms than that provided by RealPage.

Witness 4 indicated that renewal rates were also generated by RealPage and subject to a 3%-5% increase, despite the fact that at times, vacant units in the property were rented for less than renewal units subject to RealPage's imposed price increase.

69. As Camden Regional Manager, Bill Ramsey explained, "[w]e trust the system . . . [w]e don't have to sit and look at all the comps and decide, 'what is the [unit] going to lease for today?' That is all history now."[57]

70. Where lease prices were formerly set to maximize occupancy rates, RealPage's software has one goal: increasing overall revenue by raising prices on individual rental units. David Hannan, senior vice president at the Morgan Group, Inc. ("Morgan Group"),[58] a Houston-based property manager that saw its revenues grow by 5% above expectations when it implemented AI Revenue Management, characterized the transformation like this: "My generation grew up worshipping the occupancy gods. We learned that if you were not 95 percent-plus occupied, the asset was failing. But that's not necessarily true anymore . . . [RealPage] totally turns the industry upside down."[59] RealPage characterizes this transformation as a shift from an "occupancy focus" to "rent growth focus."[60]

---

[57] Rachel Azoff, *New Dynamic*, MULTIFAMILY EXECUTIVE (October 17, 2005), https://www.multifamilyexecutive.com/property-management/new-dynamic_o.

[58] While named as a defendant in several other actions consolidated in this matter, on information and belief, the Morgan Group only manages properties in Arizona, California, Colorado, Florida, Missouri, and Texas, and therefore is excluded as a defendant in the instant action.

[59] Bousquin, *supra* note 26.

[60] Vogell, *supra* note 2.

71.     A former RealPage "Pricing Advisor" ("Witness 5")[61] disclosed that in addition to daily pricing recommendations, RealPage provides its clients, including the Lessor Defendants, with a wealth of information during one-on-one, quarterly "Performance to Market" meetings ("PTMs").

72.     Witness 5 stated that the PTMs were attended by high-ranking executives from the client and RealPage's then Director of YieldStar Revenue Management, Jonathan Olson, the client's assigned Pricing Advisors, and at least one member from RealPage's Analyst group.

73.     The purpose of these meetings, per Witness 5, is to provide clients with information regarding overall market performance within the applicable region, as well as a client-specific performance review.

74.     Witness 5, along with other Pricing Advisors and their respective supervisors and analysts, spent weeks reviewing client and market data to prepare compelling charts to be presented at these PTMs.

75.     Revenue growth is strongly emphasized to property managers during these meetings, according to Witness 5, and consistent with RealPage's push to ensure property managers accept its price and term recommendations at least 80% of the time.

---

[61]     During her tenure as a Pricing Advisor, Witness 5 worked closely with RealPage clients that utilized its pricing platform. Witness 5 interfaced with property management companies daily to provide training and guidance on RealPage's revenue management software and to discuss specific aspects of the system and its processes. Witness 5 stressed that it was incumbent on her and other Pricing Advisors to train and remind clients to enter all required leasing information into the revenue management system daily. While a typical RealPage Pricing Advisor was expected to maintain a portfolio between 60 and 65 properties, Witness 5 was responsible for overseeing 90 properties that used RealPage software and her primary contacts at the property management companies included on-site managers, Regional Managers, as well as Vice Presidents and Asset Managers. Witness 5, along with other Pricing Advisors, also interfaced quarterly with senior ranking executives from the property management companies they were responsible for.

76. Witness 5 explained that the need to accept price and occupancy recommendations was RealPage's constant focus. RealPage continually reiterated to its clients that "you can run a property with fewer people living there, and still meet or exceed what you've made in the past."

77. As part of RealPage's ongoing "education" and "training" of its property management clients, RealPage's Pricing Managers frequently explained that any losses incurred due to units remaining vacant are recaptured through higher rental prices when a lease is executed. Witness 5 explained that every day a unit sits vacant, that vacancy "loss" is "built into" RealPage's daily pricing recommendation in that market.

78. Put another way, by outsourcing their pricing decisions to RealPage, each Lessor Defendant knows that the impact of the ever-rising prices set by RealPage's algorithm will outpace their vacancy losses.

79. During PTMs, RealPage also shares market intelligence with its clients. Witness 5 explained that RealPage obtained intelligence from two sources. The first of these is "survey data" which is collected through in-person or telephone interviews and obtained by RealPage through third-party vendors such as CoStar.[62] The second source is what RealPage refers to as "transactional data," by which RealPage means the actual lease terms, rental prices, vacancy rates, and other data points that it requires its AI Revenue Management clients to provide. Witness 5 explains that "survey data" and "transactional data" are "blended" into a comprehensive data set used during PTM meetings to compare the region's market performance with client's performance.

---

[62] CoStar is the self-described, "industry leader in commercial real estate information, analytics, and news [ ] provid[ing] clients with the data and tools they need to make smart decisions and stay ahead of competition," including in the multifamily rental housing market. *About CoStar*, COSTAR, https://www.costar.com/about (last accessed May 30, 2023).

80. Despite the "blended" nature of this data set, Witness 5 explained that RealPage representatives regularly advise and emphasize to clients at PTM meetings that the data presented contains ample and granular transactional data, pooled from the client's direct competitors in the region.

81. Witness 5 reports that this was often done in instances when a client would bring their own dataset (largely based on survey data) to PTM meetings to assess whether RealPage's data varied. When it did, RealPage representatives were quick to qualify its own data as more reliable than any data pulled by a property management company independently, as RealPage's data contained actual transactional data from across the market and the client's key competitors, and "any time we use the term 'transactional data' we make clear to the client that this is RealPage user's data."

82. Witness 5 stated that during weekly Revenue Management team conference calls and annual team summits, RealPage Vice President and Industry Principal, Andrew Bowen[63] often shared his "talking points" that contained information he intended to convey to RealPage clients during meetings with their executives. Bowen's "talking points" typically emphasized how RealPage's transactional data was a significant differentiator in the industry and impressed "the

---

[63] At the time, Witness 5 worked as a Pricing Advisor, Andrew Bowen served as RealPage's "Industry Principal – Asset Optimization," a role Bowen held from October 2010 through February 2022, in which his "expertise center[ed] around [RealPage's] Investment Analytics, Performance Analytics, Business Intelligence and Revenue Management solutions, and how [RealPage's] partners can leverage them to produce the results they desire." Bowen served in several roles over the course of his career at RealPage, including as a consultant implementing YieldStar Revenue Management, a manager of RealPage's Professional Service team, assisting clients in "maximiz[ing] the effectiveness of YieldStar," and as Director of Business Development for all RealPage Asset Optimization products. *See* Andrew Bowen, LINKEDIN, https://www.linkedin.com/in/andrewbowen2/ (last visited May 26, 2023).

importance of explaining to our clients the benefits of transactional data that's coming from other RealPage users."

83. Witness 5 explained that data relating to "vacant days" – how many days rental units remained vacant – was also discussed with clients during PTM meetings. This data was also displayed as a comparison between the client and regional competitors.

84. RealPage Pricing Advisors frequently discussed the upside to units remaining vacant for periods beyond what conventional industry wisdom might suggest. Witness 5 states that these discussions were typically framed as to whether it was worth having units "sit vacant for a few more days to get $50 more for a month in rent?" During PTMs, RealPage personnel stressed the benefits of relying on the pricing recommendation offered by RealPage, even when that meant a certain unit or units might remain vacant for longer periods. Defendants' coordinated efforts have been effective in driving anticompetitive outcomes: higher rental prices and lower occupancy levels.

85. RealPage also encouraged its clients, including Lessor Defendants, to abandon other traditional market share maximizing practices, such as keeping low turnover rates. Ric Campo, the CEO of Camden, admitted that Camden's turnover rates increased around 15 percentage points in 2006 after implementing YieldStar. Despite that increase in turnover rates, Camden's overall same-property revenue grew over 7% in its first year using YieldStar. "What we found," Campo said, "was that driving our turnover rate up actually captured additional revenue."[64] While Camden's turnover expenses increased by $2.5 million, revenue increased

---

[64]     Bousquin, *supra* note 26.

$12.5 million. According to Campo, "[T]he net effect of driving revenue and pushing people out was $10 million in income."[65]

86. Defendant RealPage also provides its customers with real-time information about their competitors' lease terms, and provided lease term recommendations aimed at avoiding oversupply of units caused by natural ebbs and flows in the market. The algorithm uses the occupancy data that it collects to recommend lease renewal dates that are staggered to avoid any period of oversupply. Property managers can then hold units vacant for a period, while keeping rent prices inflated.[66] This strategy of the staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which further reduces any incentive for Defendants and their coconspirators to undercut their inflated prices. This incentive is always the greatest in periods of oversupply, when the individual benefits of reducing rents to increase occupancy are highest.

87. A former Assistant Community Manager at Sunrise Management and Greystar Leasing Consultant ("Witness 6")[67] confirmed that among the factors considered in RealPage's pricing recommendation is the number of months in a lease term, as pricing would go up or down depending on the length of the lease to avoid too many vacancies and/or renewals falling on the same month.

---

[65]    *Id.*

[66]    RealPage e-book B & C Assets Ace the Market, *supra* note 6, at 4-5.

[67]    Witness 6 worked as the Assistant Community Manager for Sunrise Management (now "CloudTen Residential") from 2020 through August 2022, where she had regular, direct interactions with RealPage Pricing Advisors and was responsible for reviewing RealPage's daily price recommendations for the properties she managed. Prior to that, Witness 6 worked as a leasing consultant for Defendant Greystar (October 2019 to June 2020), utilizing RealPage's pricing platform. Witness 6 also worked as a leasing consultant with FPI Management, Inc. ("FPI Management"), however she did not use RealPage's pricing platform at FPI Management as the building she worked on was classified as affordable housing.

**D.     Defendants' Collectively Monitor Compliance with the Scheme**

88.     Defendant RealPage has various stops in place to closely monitor the Lessor Defendants' "discipline," or compliance, with the price-fixing scheme.  These include the specific "workflows," pictured below and taken from RealPage's "YieldStar Revenue Management – Manager Training" deck, which details the times and processes by which property managers accept RealPage's pricing "recommendations":

**Figure 5: "Daily Workflow" Slide from RealPage's 2022 "YieldStar Revenue Management – Manager Training" Deck[68]**



89.     Witness 5 explained that Pricing Advisors received daily alerts as to when a particular client had reviewed the daily price recommendations.   As part of their daily

---

[68]     Hereinafter, "RealPage's YieldStar Manager Training Deck."  "Community Manager," "Regional Manager," and "Asset Manager" refer to individuals who work for the property management company.  The price acceptance process begins with the Community Manager who is responsible for reviewing RealPage's daily pricing recommendations.  "Revenue Management Advisor" refers to RealPage's Revenue and Pricing Advisors assigned to that particular property management company.

responsibilities, RealPage Pricing Advisors were required to review the pricing recommendations issued for each assigned client.

90. This review, had to occur before 9:30 a.m. local time. *See* Fig. 5 above. Witness 5 recalls the client is able to: (1) "Accept"; (2) "keep yesterday"; or (3) "propose override" for each pricing recommendation.

91. To the extent a client elected to keep the previous day's proposed pricing or propose an override altogether, the client was met with a "mandatory" on-screen prompt to provide a legitimate "business reason" in writing to justify to Defendant RealPage its decision to veer from RealPage's daily pricing recommendations. As Witness 5 explained, "if the model recommended a price increase and the client said 'no,' [RealPage] would need to know what the business reason was." Figure 6 below contains an image of the pricing screen for training purposes, as depicted in RealPage's YieldStar Manager Training Deck.

**Figure 6: "Rate Review" Slide from RealPage's 2022 YieldStar Manager Training Deck**



92.     Pricing Managers were trained to use the phrase "business reason" when interacting with clients regarding their justification for an override. Witness 5 explained this was designed to impart the notion that a client's explanation has to provide acceptable reasons pertaining to property management operations to override a pricing recommendation.

93.     Witness 5 explained that if a client sought to override a pricing recommendation because the property had a higher vacancy rate for example, RealPage Pricing Advisors were trained to push back and communicate that vacancy rates were not an "acceptable business reason" because the algorithm had already taken vacancy rates into account when making its daily pricing recommendation.

94.     For Pricing Managers, a legitimate business reason had to be "something that the model could not see." To ensure clients remained "in the 80 to 85% acceptance rate" target RealPage sought, Witness 5 and other Pricing Advisors often spent considerable time

communicating this premise to "educate" clients on the pricing methodology and associated benefits of accepting all, or almost all RealPage pricing recommendations, despite increasing vacancy rates.

95.    A former RealPage Pricing Analyst ("Witness 7")[69] explained that some property management companies had their own internal revenue managers, who had undergone an extensive two-to-three-day training session with RealPage, and who obtained this title only after passing a cumulative final exam about pricing theory, YieldStar settings, and strategies.

96.    Witness 7 explained that "smaller and mid-tiered" clients typically paid for RealPage's Pricing Advisory services.

97.    Those that utilized RealPage's Pricing Advisors had daily calls with RealPage, which was the only way their software settings could be calibrated. Notably, Witness 7 stated that a property management company using RealPage revenue management software had no ability to change their own settings in any way that could impact pricing. In order to change any settings, a property management company employee at the Regional Manager level or higher needed to speak directly with a RealPage Pricing Advisor.

98.    Companies with internal RealPage certified revenue advisors had more access to adjust their own settings, in accordance with their RealPage training. Still, Witness 7 explained that even for companies with internal revenue managers, there were periodic reviews with RealPage Pricing Advisors if the company was underperforming, had a low acceptance rate of RealPage's pricing recommendations, or high variance rate. In these instances, if a RealPage

---

[69]    Witness 7 worked as a RealPage Pricing Analyst from May 2017 through December 2019. In this role, Witness 7 was responsible for reviewing reports for his portfolio of properties.

Pricing Advisor concluded that RealPage's pricing platform was not being used "correctly," then the situation was escalated.

99.     Witness 6 "consistently" relayed to RealPage representatives that the price recommendations provided for her community were way too high. Based on her experience in the market, Witness 6 believed the fair market rents for the properties in that region were much lower than RealPage's pricing recommendations. Witness 6 reported that she, "knew [rental prices] were too high, but [RealPage] barely budged."

100.     Witness 6 recalled that while most of the reasons offered to RealPage for a pricing override were deemed not "good enough," RealPage **never** accepted any attempt by the client to reject its recommendation on the basis that the price did not reflect fair market values.

101.     Highlighting this, Witness 6 noted that she understood the property markets in the areas [she] acted in, while the RealPage's Texas-based employees were not familiar with the individual local markets in which their pricing recommendations are pushed: "I'm on the ground, I see the value." In Witness 6's opinion, that value was constantly overstated by RealPage's pricing recommendations to the detriment of renters, but because RealPage is such a "monster" in the industry, people were reticent to speak up against the system.

102.     Witness 4 explained that if his property management team wanted to make changes to the price that the RealPage software autogenerated every morning, before they could even reach out to RealPage they were required to contact the Lincoln Property corporate office. In response to a request to Lincoln's corporate office for any modification to RealPage's recommended pricing, Witness 4 explained that "99% of the time," field employees were told "the rates are what they are."

38

103.    In fact, Witness 4 explained that any adjustments to rental prices were only accepted if Lincoln's website advertised a different price than that recommended by Defendant RealPage for a given unit, which would have occurred only as a result of human error.  In these instances, Witness 4's Regional Manager would obtain approval to veer from RealPage's pricing recommendation from the corporate office.

104.    Likewise, a former property manager for a company utilizing RealPage's pricing platform ("Witness 8")[70] and who was responsible for reviewing RealPage's daily price recommendations, explained that if units were sitting vacant – while a request could be made to lower the rents to fill the units – multiple steps were required before RealPage's set rents could be changed.

105.    Only Directors or Vice Presidents at the property management company were authorized to approve modifications to RealPage's pricing [after interfacing with RealPage]. Witness 8 confirmed that she was unable to manually change rents in the system throughout her tenure with the property management company.

106.    RealPage closely tracked the rates at which property managers accepted its recommendations.  Witness 5 explained that RealPage created "Rate Acceptance Reports" that detail the rate at which any given client accepted the daily recommended price provided by the RealPage algorithm over the last 28 days.

107.    Beginning in late 2019, RealPage began the rollout of a new version of YieldStar, referred to internally as "Price Optimization 2" or "POV2."  Witness 5 recalls that with this

---

[70]    Witness 8 worked as a property manager for an unnamed co-conspirator from 2018 through May 2019.  Witness 8 also worked at FPI Management as a Portfolio Manager from May 2019 through 2021.  The units in Witness 8's FPI Management portfolio were affordable housing units with government-mandated rent prices, and as such, Witness 8 did not use RealPage pricing software in this role.

updated technology, RealPage began tracking not only a client's acceptance rate, but the identity of the personnel within a client's business that issued a "keep yesterday" or "propose override" request. This increased granularity in the reports provided by RealPage enabled property management companies to more closely monitor acceptance rates within their own ranks.

108. Witness 7 confirmed that reports tracking a client's rent rates and rent variances – the amount the rent prices charged varied from what the model suggested – were used by RealPage Pricing Advisors to review with Regional Managers or Vice Presidents from the property management company during periodic performance reviews. During these reviews, Pricing Advisors would notify their client if they were succeeding in "embracing the algorithm" or if the property was underperforming.

109. In addition to Rate Acceptance Reports, RealPage created "Lease Compliance Reports" which Witness 5 referred to as "one of [RealPage's] top auditing tools." Beyond the acceptance rate, Lease Compliance Reports show the variance between a particular pricing action taken by a client for a given unit, and the pricing terms of the executed lease for that unit. On the left-hand side, these reports display the pricing action taken by the client (accept, keep yesterday, or override) and the right-hand side displays the rental price in the associated lease. In other words, the Lease Compliance Reports show whether a property management company actually charged the renter the price RealPage's system recommended, and that the property management company accepted.

110. Witness 5 explained that Lease Compliance Reports also list an overall compliance rate at the bottom of the report, which is expressed as a negative percentage. During her tenure as Pricing Advisor 2 (2014-2020), if a client was fully "compliant" in transferring RealPage's pricing recommendations into the executed lease, they received a score of zero percent. If a client deviated

by 15% it would be expressed as -15%. Per Witness 5, acceptable deviation rates between the client's pricing decision in the RealPage software environment and executed leases should be no higher than 2%-3%.[71]

111.    Importantly, Lease Compliance Reports provide a figure for the total revenue lost due to a client's deviation, including present losses and extended losses calculated over the course of a one-year period. These figures are intended to impress on cartel members the collective benefit of near perfect adherence to RealPage's pricing recommendations. Witness 5 stressed that during PTM meetings, RealPage personnel were trained to, and did, emphasize the significant pecuniary impact associated with non-compliance.

112.    RealPage's provision of these reports and resources to the Lessor Defendants is economically irrational absent a price-fixing cartel and is done for the sole purpose of ensuring that acceptance rates remain within Defendant RealPage's target, and deviations from accepted pricing in executed leases, as close to zero as possible by helping Lessor Defendants identify employees that exercised independent judgment in setting rents.

113.    Through the review and discussion of these Lease Compliance Reports during PTM meetings, Witness 5 reported that RealPage personnel successfully persuaded clients that it was in their best interest to: (1) accept all or substantially all of RealPage's pricing recommendations; and (2) ensure those rates were effectively included in the operative lease agreement.

114.    Because RealPage's revenue is largely derived from "license and subscription fees relating to [RealPage's] on demand software solutions, typically licensed over one year terms; commission income from sales of renter's insurance policies; and transaction fees for certain of

---

[71]    Note, this a separate measurement to acceptance of the rate recommended by RealPage in the software environment.

our on demand software solutions," in addition to selling new software licenses, RealPage has an interest in facilitating the cartel to ensure property management companies see the revenue increases RealPage claims its software yields, thereby incentivizing existing clients to renew their software licenses annually.[72]

115.    Witness 5 explained that when Lease Compliance Reports reflected lower than expected compliance rates, high-ranking executives from property management companies often expressed frustration with their own internal compliance measures.  As one example, Witness 5 indicated that during discussions concerning the compliance rate reflected in the Lease Compliance Report prepared for client, First Pointe Management Group ("First Pointe"), First Pointe President Christina Agra-Hughes became agitated at the deviation rate reported and asked rhetorically during the PTM, "why the hell aren't my teams following the model?"

116.    According to Witness 5, RealPage would, in addition to the PTM meetings, and depending on the client, have its Pricing Advisors host weekly, bi-weekly, and/or monthly calls with property management companies.  During these calls Pricing Advisors would conduct "Performance Reviews."  A RealPage Pricing Advisor's task was to assist clients in understanding the Revenue Management methodology so that clients would more closely adhere to RealPage's pricing recommendations.  Notably, Witness 5 stated that Defendant RealPage almost exclusively recruited its Pricing Advisors/Manager from property management companies, trusting that this permitted its Pricing Advisors to exude a level of expertise and authority that would convince clients to trust RealPage's pricing recommendations over their local knowledge.

117.    Following her employer's implementation of RealPage's revenue management software in or around 2021, Witness 6 attended weekly meetings with RealPage representatives

---

[72]    RealPage 2020 Form 10-K, *supra* note 23.

during which the Pricing Advisor would review Sunrise Management's acceptance rate and executed leases. During one of these meetings, Witness 6 was questioned as to why certain leases did not adopt RealPage's recommended pricing. In one instance, a rental unit was advertised at $1,650/month despite RealPage recommending a price of $1,895/month, nearly 15% higher. Witness 6 elected to honor the advertised price over RealPage's recommended price and was consequently reprimanded by her supervisor, a Sunrise Management Regional Manager.

118.    A former Community Director for various properties managed by FPI Management from 2014 through 2021 ("Witness 9"),[73] similarly confirmed she participated in "routine" and "scheduled" calls with RealPage Pricing Advisors, during which RealPage Advisors inquired about rents, renewals, and any incentives FPI Management may have offered potential or existing renters. During these routine calls, RealPage would inform FPI Management of how their property was performing compared to its competitors in the regional market.

119.    While Witness 6 stated that RealPage advisors were "pretty involved" with the rent-setting process during her time at Sunrise Management, Witness 9 indicated that RealPage was "really involved" in the rent-setting process for FPI Management. Indeed, Witness 9 stated that while Pricing Advisors were always kind and informative, they frequently "nudged [her] to accept the [pricing] recommendations. Successfully so, as Witness 9 confirmed she "relied a lot on what [RealPage] recommended" and adopted 90% of RealPage's pricing recommendations. Even in instances when FPI Management sought an override, it ultimately deferred to RealPage the vast majority of the time.

---

[73]    As a Community Director, Witness 9 was responsible for working directly with the corporate office for FPI Management, running budget-related reports, approving rental applications, and generally overseeing hundreds of multifamily rental housing units managed by FPI Management. Witness 9 was responsible for reviewing and approving RealPage's daily price recommendations.

**E.** **Property Managers Who Adopted RealPage's Pricing Recommendations Did so with the Common Goal of Raising Rent Prices Which Conspiracy Caused Inflated Rental Prices and Reduced Occupancy Levels in the Greater Nashville Metro Area**

120. Cartel members share their confidential data with the knowledge that RealPage will base its recommended rents to their competitors on the data provided, in essence providing their competitors with clear insight into their confidential business information. Cartel members also know their competitors are likewise sharing their own confidential business information with RealPage, from which each cartel member can glean information about their competitors' pricing, as well as other data points. Witness 1 stated that he believed that RealPage's clients all knew their data would be going into a central pool and indicated that the revenue management system was pitched to prospective clients as a system that would take all available data – including data from competitors in the region – into account to "maximize revenue." Indeed, RealPage informs both current and prospective clients that its revenue management software includes "competitor rent data [as] one of the several data inputs" into its algorithm in the "FAQs" section of its website relating to revenue management software.[74] Witness 5 also confirmed that RealPage representatives regularly advised clients during PTMs that the pooled data reviewed during these meetings contained their regional competitors' transactional data.

121. RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it is "[b]uilt on the market's largest real-time data set."[75] Coordinated algorithmic pricing allows property managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set

---

[74] RealPage Revenue Management FAQs, *supra* note 34.

[75] The RealPage e-book, Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield, REALPAGE, INC. (2020).

prices for client property managers' properties "as if we [RealPage] own them ourselves."[76] Put differently, the software allows the independent property managers to operate as if they were one company setting prices.

122. This mutual sharing of information only makes sense when cartel members are confident that their competitors will not use the information to gain a competitive advantage by lowering rents to lure away customers. As Davidoff stated, while all property management companies "would be better off limiting their rent reductions," if any property management company "lower[ed] their rents while the others don't, then that [property management company] would outperform."[77] Recognizing this, RealPage urged its clients to "shop your competitors over the phone, in-person, and view their websites."[78]

123. Property managers who use RealPage AI revenue management software do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing. Defendant RealPage advertises that its customers "outperform the market by 3–7% year over year."[79] RealPage's clients find its revenue management services particularly helpful because, as RealPage explains, those services allow the property managers to "make sure we're limiting our supply when there isn't too much demand."[80]

---

[76]     RealPage Renewal Reporting Presentation, *supra* note 5.

[77]     Davidoff, *supra*, note 25.

[78]     *See* Figure 3, *supra.*

[79]     *YieldStar Predicts Market Impact Down to Unit Type and Street Location*, REALPAGE, INC.,     https://www.realpage.com/videos/yieldstar-data-scientists-help-manage-supply-demand/ (last accessed May 29, 2023) ("Find out how YieldStar can help you outperform the market 3% to 7%").

[80]     *RealPage Revenue Management Maximizes Market Opportunity*, REALPAGE VIDEOS (Dec 2,     2019),     https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/ (interview with John Kirchmann, CFO of IRET Property Management).

45

124.    In a promotional video on RealPage's website, Holly Casper, Vice President of Operations for RKW Residential described that RealPage takes on the burden of "implementing the increases in these rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue for those units."[81]

125.    In training materials provided to RealPage clients, titled "Revenue Management System, Quick Reference Guide" (2022), RealPage describes its pricing services as one specifically designed to "maximize rents," and explained that "RealPage['s] Revenue Management system allows you to continuously maximize asset value by leveraging data to consistently reduce vacancy and maximize rent."

126.    Witness 5 explained that every Friday, Witness 5, along with other Pricing Advisors and members of the YieldStar team, participated in conference calls to discuss various operational matters.  During these calls, RealPage executives, including Andrew Bowen, regularly stressed to call participants, that a key company objective concerns the rate at which clients accepted RealPage's pricing recommendation.

127.    By enforcing price discipline and setting rents that result in lower occupancy rates, Defendant RealPage provides assurances that all property managers using its software are doing the same thing – raising rents and accepting lower occupancy instead of lowering the price to fill units.  It also provides assurances to each of RealPage's clients to know that their competitors will not be able to "cheat" on the cartel and expand market share by undercutting RealPage's price recommendations.  In this way, RealPage enables property managers to overcome the prisoner's

---

[81]    *YieldStarTM Revenue Management Optimizes Rent Pricing*, REALPAGE VIDEOS (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/ (testimonial of Holly Casper, Vice President of Operations for RKW Residential).

dilemma that prevented coordinated pricing in the historical market for residential rental apartments.[82]

128.    Indeed, property management companies have their own internal measures in place to enforce price discipline in accordance with the conspiracy.  Amy R. Smith, Managing Partner of Bella Investment Group, LLC ("Bella") explained that during her revenue management system training, "[w]e were warned that the biggest hurdle is overcoming the emotions and instincts of experienced property managers.  Many managers and regional staff will see rents rising at a rate greater than they are used to and may want to override what the system suggests we charge.  Because of the rent-based parameters we set within the system that is generally not necessary."  To combat this and encourage adherence to RealPage's recommendations, many property management companies base staff members' bonuses, in part, on revenue.  Smith explained that without such incentives the staff might:  "bring a level of caution to rental rates that they might set," and that "[u]ntil they trust the system, there will be temptation to override the algorithm if rents appear too aggressive."[83]  Put another way, Smith admits that RealPage leads Bella to set prices at levels higher than it would otherwise do in a competitive environment.

129.    Defendants and their co-conspirators are aware that the higher revenues they obtain using Defendant RealPage's software are the result of increasing average rent prices in the neighborhoods they serve.  In a video to attract additional cartel members that was shown at a conference for real estate executives in the summer of 2021, RealPage vice president Jay Parsons noted that average rents had recently shot up by 14%.  "Never before have we seen these numbers,"

---

[82]    *See* Salil K. Mehra, Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels, 26 STAN. J.L. BUS. & FIN. 171, 197-203 (2021).

[83]    Bergeron III, *supra*, note 10.

he said.[84]  Parsons then asked Andrew Bowen, RealPage's then Vice President of Investor Markets, what role he thought the company had played in the unprecedented increase.  "I think it's driving it, quite honestly," Bowen replied.[85]  Indeed, Witness 1 confirmed he is confident that RealPage's Revenue Management system effectively and artificially skewed rental prices between at least 2014 through 2018, during his tenure at the company.

130.    Witness 6 explained that in 2020, prior to implementing RealPage's revenue management software, a two-bedroom unit in the Sunrise Management community she oversaw was priced at $1,650/month.  Upon adopting RealPage's revenue management software the following year in 2021, rents for those same units immediately increased over 27% to nearly $2,100, with no improvements to the units whatsoever.  Witness 6 characterized these units as "very basic, standard homes" built in the 40s, with no in-unit washer and dryer, and "completely agrees" that rental prices in her region were artificially inflated upon its adoption of RealPage pricing recommendations.

131.    Similarly, Witness 9 confirmed there was an increase in revenue once the properties she was responsible for adopted RealPage pricing, which led to immediate revenue growth for the company.  Specifically, at the Kirker Creek Apartments managed by FPI Management ("Kirker Creek"),[86] Witness 9 noticed "significant changes" in rental price increases upon implementation of RealPage's revenue management software, where even unrenovated apartments saw rent increases between 8%-10% with RealPage pricing, despite their condition and dated, "80s style."

---

[84]    Vogell, *supra*, note 2.

[85]    *Id.*

[86]    FPI Management Inc.'s Kirker Creek Apartments are located in Pittsburg, California.

132.     Witness 9 explained that prior to FPI Management's acquisition of Kirker Creek, the property did not utilize RealPage, and the previous owners charged "nowhere near" the amount FPI Management charged, utilizing RealPage pricing.  "There was a significant difference.  I can't put a number on [the price difference], but even non-renovated apartments were renting high."

133.     After her tenure at RealPage, Witness 5 assisted a Seattle-based property management company, with the rollout of its first five YieldStar/AI Revenue Management-enabled properties.  Prior to using RealPage's AI Revenue Management system, the management company was "really [a] mom and pop" operation.  Since implementing RealPage's pricing software however, it has enjoyed significant revenue increases by accepting RealPage's daily recommended pricing for a portfolio of properties that had not raised rents "for years."

134.     Indeed, Witness 5 confirmed that every RealPage client she managed during her tenure as a Pricing Advisor saw revenue growth once they adopted RealPage's revenue management software.  For example, one RealPage client saw a revenue increase of 21% in the first year after adopting AI Revenue Management.  Prior to implementing AI Revenue Management, this client had increased rents by 3% every year, around $25 per lease renewal.  The incredible growth after the client adopted AI Revenue Management was realized across all of client's twenty properties, confirming that RealPage, rather than any other factors, drove the results.

135.     RealPage's impact on the multifamily rental market is best summarized by Kortney Balas, Director of JVM Realty Corporation in a testimonial video since removed from RealPage's website: "the beauty of using YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[87]

---

[87]     Vogell, *supra*, note 2.

136.    Senior Vice President for Management at Post Properties, Jamie Teabo, similarly noted that "[i]n our Florida markets, we let the system push as hard as it would go, and we saw increases as high as 20 percent . . . Left to our own devices, I can assure you we would have never pushed rents that hard.  That was a big number."[88]

137.    Defendant RealPage's software not only facilitates price hikes, but it also allows conspirators to *maintain* higher prices.  Indeed, RealPage claims that Defendant property managers and their co-conspirators were able to maintain rent prices 7% above the competitive market rate.  Speaking at a RealPage webcast June 17, 2020, America Melragon, a former VP of revenue management for Defendant IRT, discussed how property managers can stabilize rents by using RealPage's software.  According to Melragon, "We've noticed . . . competitors that are manually pricing have already started to experience pretty significant swings in their effective price. . . .  For us, really having that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipated it to be."[89]  RealPage refers to independent, competitive pricing as "manual pricing."

138.    Defendants' conspiracy allows property managers to hike rents even higher when demand is strong without needing to lower them when it is weak.  It untethers rent prices from their natural constraints, forcing renters to spend more money than they would have in a competitive rental market.  Moreover, the collusion has contributed to the national housing crisis by placing massive pressure on renters' efforts to keep roofs over their heads.

---

[89]    *IRT Gains Pricing Stability with RealPage Revenue Management*, REALPAGE VIDEOS (June 17, 2020), https://www.realpage.com/videos/irt-gains-pricing-stability/.

139.    Specific to the Greater Nashville Metro Area, Defendants and co-conspirators control hundreds of thousands of apartment units, including tens of thousands of units in the most desirable neighborhoods.

140.    Yet, in the years preceding the COVID-19 pandemic,[90] vacancies trended upwards.[91]  Despite rising vacancies, with the help of RealPage, Defendants were able to continue to raise rents year over year over year, demonstrating the disconnect between supply and demand.

**F.    Preliminary Economic Analysis Confirms the Impact of RealPage's Revenue Management on Multifamily Rental Markets, Including Nashville**

141.    Preliminary economic analysis provides a glimpse into the impact of RealPage's rental pricing software on multifamily rental markets and corroborates evidence of the alleged conspiracy, including the accounts of Witness 1 and Witness 6.  Specifically, it suggests (i) the increased revenues illicitly obtained by Defendants were the result of proportionally higher and artificially inflated rental price increases paid by Plaintiff and Members of the Class; and (ii) the increase in multifamily rental housing prices near the start of the Class Period in 2016, and through the present, cannot be explained by common supply or demand drivers, rather a significant structural break in these relationships can be observed in similar multifamily rental housing markets near the start of the Class Period.

**i.    The Range of Illicit Revenues Defendants Realized Resulted from Proportionally Higher, Artificially Inflated Rent Increases Borne by Plaintiff and Members of the Class**

142.    As discussed in Section E, Defendant RealPage's model works to increase revenue by raising rent prices while accepting lower occupancy levels.  RealPage has not been shy about

---

[90]    *See* generally note 16, *supra*, explaining why current occupancy rates are not reflective of market conditions.

[91]    *See* Figure 2, *supra*.

this mechanism of action. During a 2017 earnings call, then-CEO of RealPage, Steve Winn, offered as an example one large property company, managing over 40,000 units, which learned it could make more profit by operating at a lower occupancy level that "would have made [that property manager's] management uncomfortable before."[92] Prior to adopting YieldStar, the company had targeted 97% or 98% occupancy rates in markets where it was a leader. After outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate.[93] In other words, RealPage claimed to increase the revenue of rental properties by 2%-7%[94] despite the cost of having vacancy rates that were at least two percentage points higher on average. Since the property manager realizes the increase revenue despite leasing fewer units, the property manager's per-unit rental price increased by more than 2%-7%.

143. Consider the scenario depicted in Figure 7, which reflects the Nashville market. Prior to 2015, monthly rents in the Greater Nashville Metro area were $1,258.89 according to the Zillow Observed Rent Index Model ("ZORI"),[95] and vacancy rates were 3.70% according to the United States Census Bureau, in December 2015. Thus, a building with 100 units representative of the Nashville area as of December 2015 would have 96.3 occupied units,[96] and assuming rental

---

[92]      Vogell, *supra*, note 2.

[93]      *Id*. Consistent with this, Witness 9 confirmed that FPI Management targeted a 95% occupancy rate during her tenure with the company.

[94]      *See* Vogell, *supra*, note 2.

[95]      The ZORI Model measures changes in asking rents over time, controlling for the changes in the quality of available rental stock. ZORI is currently calculated at the national, metropolitan, county, city, and ZIP Code levels for all regions where sufficient data is available. Joshua Clark, *Methodology: The Zillow Observed Rent Index (ZORI)*, ZILLOW (Sept. 19, 2022), https://www.zillow.com/research/methodology-zori-repeat-rent-27092/.

[96]      For the purpose of this simple regression model, fractional units are assumed possible.

price of $1,258.89 across those units, implies revenue of $121,230.72 to the owners ($1,258.89 x 96.3 occupied units).

**Figure 7: Demonstrative Table Using Zillow Zori Model and U.S. Census Bureau 2015 Data (Without RealPage)**

| *Without RealPage* | | |
|---|---|---|
| Building Number of Units | (A) | 100 |
| Nashville Monthly Rental Prices (Zillow Zori Model) | (B) | $1,258.89 |
| Nashville Vacancy Rates (US Census) | (C) | 3.70% |
| Occupied Building Units | (D=A x (1-C)) | 96.30 |
| **Total Revenue/Month** | (E=B x D) | $121,230.72 |

144.    Figure 8 below demonstrates the following: at the low end of the range RealPage advertised increases revenue of 2%, this would amount to an increase of $2,424.62 in revenue, for a total revenue of $123,655.34 for this same building.  However, assuming a simultaneous increase of vacancy by two percentage points like that touted by RealPage's CEO during its 2017 earnings call, this would result in only 94.3 units occupied.  This implies that to achieve the targeted 2% revenue increase the monthly rent per unit would need to rise to $1,311.30 per month, a 4.16% rise.  To achieve RealPage's advertised revenue increase of 7%, RealPage clients would need to raise their monthly rent by 9.27% to recover the occupancy increase.  These increases amount to $52.41 to $116.69 in extra monthly rent per unit, respectively.

**Figure 8: Demonstrative Table Using Zillow Zori Model and U.S. Census Bureau 2015 Data (with RealPage)**

| *With RealPage* | | | |
|---|---|---|---|
| Increased Performance Scenario | (F) | 2% | 7% |
| New Revenue | (G=E x (1+ F)) | $123,655.34 | $129,716.87 |

| *With RealPage* | | | |
|---|---|---|---|
| New Vacancy Rate (2 percentage points higher) | (H) | 5.700% | 5.700% |
| Occupied Building Units | (I=A x (1-H)) | 94.3 | 94.3 |
| Nashville Rental Prices (Using RealPage) | (J=G/I) | $1,311.30 | $1,375.58 |

| | | |
|---|---|---|
| **Increase in Rent (%)** | **4.16%** | **9.27%** |
| **Increase in Rent ($)/Month** | **$52.41** | **$116.69** |

145.    Consistent with these figures, Plaintiff Goldman experienced two rent increases within a year's time.  First, with his lease renewal beginning November 15, 2021, Plaintiff's rent rose 4.6% above the starting rental price reflected in his initial lease dated, April 15, 2021.  By his second lease renewal on November 15, 2022, Plaintiff's rent increased nearly 10% year-over-year.

146.    Further, as discussed above, market participants perceived that RealPage's price decisions raised rental prices above competitive levels.  For example, a former RealPage Vice President (Witness 1), confirmed that based on conversations he had during his tenure with RealPage, he believed rental prices were skewed as a result of RealPage's pricing software.  Similarly, Witness 6, who also worked with RealPage in connection with her role as a Leasing Consultant with Defendant Greystar, confirmed she "completely agrees" that rental prices were artificially inflated upon the adoption of RealPage pricing recommendations.

### ii.    Supply and Demand Factors Do Not Explain Inflated Rental Prices

147.    A regression analysis is a statistical method that describes the relationship between two or more variables.  Typically expressed in a graph, the regression method tests the relationship between a dependent variable against independent variables.  A preliminary regression analysis conducted in markets similar to Nashville for multifamily rental housing suggests a structural

break between the forces of supply and demand nearing the start of the Class Period.[97]  While multifamily housing rental markets differ from region-to-region, certain common characteristics between the Nashville, Atlanta, and Chicago multifamily rental housing markets render this preliminary analysis particularly useful when examining the effects of the adoption of RealPage's pricing recommendations in the Nashville market, effects consistent with the rent and occupancy graphic depicted in Figure 2, *supra*.

148.    All three cities, Nashville, Atlanta, and Chicago are major urban centers with vibrant economies that attract a significant number of renters seeking job and educational opportunities, as well as the convenience of well-developed transportation infrastructures. According to the U.S. Census Bureau's American Community Survey (ACS) data from 2019, approximately 34.2% of housing units in Nashville were renter-occupied, while 35.7% in the Atlanta metro region, and 35.6% in the Chicago metro region were renter-occupied.[98]  These congruent figures further demonstrate the utility in the analysis conducted in like markets where publicly available data was available, to show what economic theory predicts would be the effects in the Nashville market.

149.    Much like the Nashville data represented in Figure 1, in recent years, Atlanta and Chicago have similarly experienced rising rental costs as demonstrated in Figures 9 and 10, below.

---

[97]    Plaintiff could not identify publicly available data covering the Nashville rental market sufficient to conduct a Nashville specific regression.

[98]    Selected Housing Characteristics, United States Census Bureau American Community Survey,                                                                                      (2019), https://data.census.gov/table?q=DP04&g=310XX00US12060,16980,34980&y=2019.

**Figure 9:  Average Rents in Atlanta, Georgia (2015 – 2023)**



**Figure 10: Average Rents in Chicago, Illinois (2015 – 2023)**



150. The simple regression model depicted in Figure 11 below tests the relationship between vacancy rates and rental prices in the Atlanta Metropolitan Area and demonstrates the effects of Defendants' conspiracy. Here, the regression first tested the impact of vacancy rates on rental rates during the period from 2010 through 2016 ("pre-period") to understand the relationship between vacancy rates and rental prices in the time period before RealPage's revenue management software became pervasive. Figure 11 shows that during the pre-period, there was a negative relationship between effective rents and vacancy rates, which is expected from economic theory. That is, it shows that an increase in vacancy rates (supply) generally resulted in a decrease in rental price. Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in Atlanta will reduce rental prices by $21.78 per month. While the

pre-period regression is simplistic, it yielded a R-square[99] of 75.13%, which is substantial. In other words, during the pre-period, 75% of rental price variations can be explained by the operative vacancy rate.

151. The pre-period regression results are consistent with property managers previously pursuing the "heads in beds" policy to rent setting.

**Figure 11: Atlanta Effective Rents and Vacancy Rates 2010 – 2020**



152. The right-side of the graph in Figure 11 represents the same regression analysis performed but for the post-2016 period ("post-period"), during which RealPage's pricing software

---

[99] R-square is a statistical measure in a regression model that determines the proportion of variance in the dependent or "response" variable (rental prices) that can be explained by the independent variable or "mean" (vacancy rates). 0% represents a model that does not explain any of the variation in the response variable around the mean and R-square of 100% represents a model that explains all the variation in the response on the mean. Typically, the larger the R-square, the better the regression model fits the observation.

was increasingly adopted. Note that during the post-period, rental prices no longer exhibited any relation to vacancy rates, but in general tended to move in the opposite direction than that predicted by economic theory. That is, as vacancy rates trended upwards, meaning there was an increase in supply of multifamily rental housing units, rental prices did not decrease in response as they had in the pre-period. Instead, rents continued to rise in conflict to basic economic principles of supply and demand. Indeed, the post-period R-square of 5.91% indicates that the previously strong relationship between vacancy rates and rental prices had been severed in the post 2016 period. This structural break is indicative of the impact of Lessor Defendants' adoption of RealPage's pricing decisions.

153. These same pre-and-post-2016 negative and inverse directional relationships between vacancy rates and rental prices can be observed in Figure 12 below, for the Chicago, Illinois multifamily housing rental market.

**Figure 12: Chicago Effective Rents and Vacancy Rates (2010-2022)**



154.   The structural shift between vacancy rates and rental prices in the pre-and-post-periods are further depicted in Figures 13 and 14 below, which graphs represent the relationship between rental prices and occupancy rates for properties managed by Camden in Atlanta, Georgia and Charlotte, North Carolina,[100] respectively.  Note that in Figures 13 and 14, the percentage of vacant units is expressed as an "occupancy rate" rather than vacancy rate.  That is, as the occupancy rate increases, vacancies decrease, and vice versa.

155.   Notably, Figure 13 demonstrates that as occupancy rates at Camden's Atlanta properties decreased rapidly beginning 2017, rental prices drastically increased over this same time.  As an example, in the second quarter of 2017, the occupancy rates across Camden's Atlanta properties measured approximately 95.8%, while the average rental price was $1,299.  While occupancy rates at these same properties in fact dropped by Q2 2018 to 95.6%, and to their lowest since prior to the time captured in this graph sometime between 2017 and 2018, rents at Camden's Atlanta properties increased *over 31%* in the span of just one year, while at the same time, vacancies increased.

---

[100]   According to the U.S. Census Bureau's American Community Survey (ACS) data from 2019, approximately 34.6% of housing units in the Charlotte metro region were renter-occupied, less than half a percentage point variance with data available for Nashville, showing a renter-occupied rate of 34.2%.

**Figure 13: Camden Property Trust - Effective Rents and Occupancy Rates in Atlanta, GA (2008-2022)**



156.     This disconnect between supply and demand during this same time period is further demonstrated in Figure 14, which measures the relationship between occupancy rates and rental prices for Camden's multifamily rental housing properties in Charlotte, North Carolina. Here, during the same period discussed above, in Q2 2017 Camden's Charlotte properties measured at an occupancy rate of approximately 96.6%, and the average rent for these properties was $1,272. Again, despite the decrease in occupancy rate by nearly one percentage point to 95.7% by Q2 2018, still, rents increased nearly 20% over this time.

**Figure 14: Camden Property Trust - Effective Rents and Occupancy Rates in Charlotte, NC (2008-2022)**



157.     The foregoing preliminary economic evidence corroborates the existence of the alleged conspiracy and confirms the impact of RealPage's rental pricing software on Plaintiff and Members of the Class.

**G.     "Plus Factors" in the Multifamily Rental Housing Market Provide Additional Evidence of a Price Fixing Conspiracy**

158.     The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the market for multifamily rental housing units highly conducive to collusion.  Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly

coordinated action," and therefore support an inference of collusion.[101] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[102]

159. Specifically, the following plus and super plus factors support an inference that Defendants' actions constituted a *per se* unlawful price fixing conspiracy not merely parallel conduct: the multifamily rental housing market (i) is highly concentrated; (ii) has high barriers to entry for would-be competitors; (iii) has high switching costs for renters; (iv) has inelastic demand; and (v) offers a fungible product. In addition, Defendants (vi) exchange competitively sensitive information; (vii) and have motive, opportunities, and invitations to collude.

### iii. The Multifamily Rental Market Is Highly Concentrated

160. The market for multifamily rental housing units is highly concentrated. A relatively small number of large property management companies, including the Lessor Defendants, control a significant number of the multifamily rental housing properties in metropolitan areas throughout the United States. Moreover, the market for multifamily revenue management software is even more concentrated. While RealPage claims it collects data on over 16 million units, its 2020 10-K filing indicates RealPage clients in fact control 19.7 million, out of a total 22 million investment-grade units in the country. In other words, RealPage's clients comprise nearly 90% of the U.S. market for multifamily rental housing units.[103]

---

[101] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[102] *See id.* at 426.

[103] Gal Meiron, *How Business Intelligence Can Clear Up a Cloudy Forecast*, REALPAGE, INC., (July 29, 2020), https://www.realpage.com/blog/how-business-intelligence-can-clear-up-a-cloudy-forecast/.

#### iv.    High Barriers to Entry

161.    Any prospective competitor seeking to enter the market for multifamily rental housing and compete with the large property management companies faces significant barriers to entry, including the time and financial resources needed to develop a multifamily rental housing property portfolio through some combination of acquisition and new construction.

162.    In addition to the costs to build or acquire, developing and maintaining a multifamily rental housing property takes years, meaning new entrants into the market are unlikely to discipline cartel pricing in the short or medium term.

163.    Similarly, any software company seeking to provide software that competes with RealPage – in a non-collusive manner – faces significant barriers to entry, including convincing cartel members to switch to a service that will, by definition, provide them with less revenue and less profit than the RealPage cartel does.

#### v.    High Switching Costs for Renters

164.    Significant switching costs prevent effective price competition in the multifamily rental housing market.  A significant portion of Defendants' anticompetitive scheme involves increasing rents to supracompetitive levels when a lease comes up for renewal.  Many tenants are forced to absorb inflated rents owing to the costs associated with moving altogether, the time and labor required to locate a new apartment, and the disruption to family, work, and personal life caused by moving, make switching to a better-priced alternative – if one were available – cost prohibitive.

165.    Additionally, for renters who seek to switch to a better-priced alternative – if one were available – mid-lease, they will likely face significant financial penalties for doing so.  These penalties may include, among other things: the forfeiture of a security deposit that typically

amounts to at least one month's rent or the requirement that the renter continue paying rent until the property is re-leased.

166.    Because of these high switching costs and lack of substitutability, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices. This creates a certain degree of natural market power for owners of rental properties and makes collusion more effective because even if a competing property manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so. Moreover, where price increases are occurring throughout broad geographic areas – as they do when the dominant landlords all enter a pricing cartel – renters often do not have any lower-priced options available in reasonable proximity to their work, school, or home. As such, renters cannot simply turn to alternative lessors in their region to discipline cartel pricing.

### vi.    Inelasticity of Demand

167.    The demand for multifamily rental housing units is highly inelastic, meaning an increase in rental housing prices tends to result in increased profits to the property management company without triggering substitutions sufficient to outweigh the benefit of profits reaped from units rented at the higher price points. The only reasonable alternative to renting is purchasing a home, and for many renters, that is not an option either financially or logistically. Owing to this and the high switching costs discussed above, no reasonable substitutes exist to discipline cartel pricing.

### vii.    Multifamily Rental Housing Units Are a Fungible Product

168.    When controlling for certain characteristics of multifamily rental housing properties, including among other things, the age of the building, the number of bedrooms and bathrooms, amenities available, location, and access to public transportation, units within like

classes of properties are generally interchangeable. That is, each unit has the basic requirements for all tenants which drive marketing, sales, and leasing decisions for units within that class.

169.    Indeed, many units in multifamily rental housing properties located in metro areas have similar amenities, including parking, exercise facilities, swimming pools, common areas, business centers, and internet access, and are thus readily comparable based on these objective features, as well as by rent and square footage. Defendant RealPage itself recognizes this and through its analytics services classifies and clusters similar multifamily rental properties and "benchmarks them at the market, submarket and ZIP code level." Those services provide property management companies with "a true apples-to-apples comparison" between largely fungible apartments in its pricing recommendations.[104]

170.    Property Management companies recognize this too. Emily Mask, ECI Group's Associate VP of Operations and Revenue has acknowledged that, RealPage is "correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."[105]

### viii.    Defendants Exchange Competitively Sensitive Information

171.    The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[106] As described above, Defendant RealPage requires client property managers to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions.

---

[104]    Brandon Crowell, *Property Classification: It's Important to Get it Right*, REALPAGE ANALYTICS (Mar. 21, 2016), https://www.realpage.com/analytics/property-classification-its-important-to-get-right/

[105]    RealPage e-book B & C Assets Ace the Market, *supra*, note 6, at 5.

[106]    Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. UNIV. L. REV. 1581, 1608 (2021).

This data, which would normally be kept private, is fed into the algorithm which sets coordinated rents among competing property managers. Importantly, individual property managers would be competitively disadvantaged by providing private data to other property managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by its competitors.

### ix. Motive, Opportunities, and Invitations to Collude

172. Defendant RealPage provides property managers with a motive to conspire by advertising its software and claiming it can increase revenue by 3% to 7%.[107]

173. RealPage's software provides its client with an opportunity to coordinate prices and thereby achieve revenues that would be unavailable if a rental management company acted unilaterally. RealPage's advertisements are explicit that this is both the goal and the effect, a naked invitation to collude.

174. Defendants have multiple opportunities to conspire through virtual or face-to-face meetings, online user groups, and through participation in various trade associations. For example, RealPage's User Group provides Lessor Defendants with a private, password-protected forum that is only available to RealPage clients and its employees, in which Defendants can "interact with product managers and other clients"[108] and "create a completely integrated solution for the multifamily industry."[109] The User Group has over 1,000 members and includes an "Idea Exchange" forum, monitored by RealPage, in which Defendants are encouraged to share ideas and comment on RealPage practices.

---

[107]     Revenue Management: Proven in any Market Cycle, *supra*, note 17, at 6.

[108]     *Best Practices*, REALPAGE, INC., https://www.realpage.com/user-group/best-practices/ (last accessed May 26, 2023).

[109]     User Group Overview, supra note 19.

175.    Additionally, RealPage hosts online forums and in-person conferences for property managers[110] and maintains standing committees of cartel members to advise on pricing strategy,[111] all of which provide opportunities for more direct collusion.  Committee members are required to join quarterly conference calls and attend the annual meeting at the "RealWorld" conference, discussed below.

176.    RealPage hosts an annual RealWorld three-day conference, which typically draws over 1,000 attendees, including representatives from Lessor Defendants, among others, and which not only provides Defendants with the opportunity to collude, but in fact ***encourages*** the exchange of ideas between and among the Defendants.

177.    Industry trade associations serve as conduits of the cartel and facilitate opportunities to conspire and exchange information through meetings, webinars, and information portals, all of which are accessible only to trade association members.  For example, the National Multifamily Housing Council ("NMHC") hosts several events each year in cities throughout the United States; its "Chair Circle Sponsors" include RealPage, Greystar, and other prominent property management companies.

178.    Additionally, national and regional trade associations provide Defendants with further opportunities to collude by providing venues for cartel members to further the cartel's aim.  Among others, these include the National Apartment Association, Institute of Real Estate Management, Pension and Real Estate Association, Urban Land Institute, National Association of Residential Property Managers, and Tennessee Apartment Association.

---

[110]    *RealWorld 2023*, REALPAGE, INC., https://www.realpage.com/realworld/ (last accessed May 26, 2023).

[111]    User Group Overview, *supra*, note 19.

## V.    RELEVANT MARKET

179.    The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is in and around the Greater Nashville Metro Area, as defined above.

180.    Multifamily real estate leases in the Greater Nashville Metro Area comprise of a distinct product market and geographic area.

181.    Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for multifamily rental apartment units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.  Nor is single-family real estate considered an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security.

182.    Geographically, given that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, renters in the Greater Nashville Metro Area do not consider multifamily residential leases in other metro areas as adequate substitutes for multifamily residential leases in the Greater Nashville Metro Area because the daily commute would take multiple hours in each direction.

## VI.    CLASS ACTION ALLEGATIONS

183.    Plaintiff brings this action on behalf of himself, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent for a residential unit in the Greater Nashville Metro Area owned, managed, or controlled by a Defendant using YieldStar, AI Revenue Management, or any other RealPage software from January 1, 2016, to the present.

184.    Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

185.    The Class is so numerous as to make joinder impracticable.  Plaintiff does not know the exact number of Class members because such information presently is in the exclusive control of Defendants.  Plaintiff believes that due to the nature of the residential rental market there are likely tens of thousands of Class members in the Greater Nashville Metro Area.

186.    Common questions of law and fact exist as to all members of the Class.  Plaintiff and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate.  Common issues of fact and law include, but are not limited to the following:

> (a) Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for residential units in the Greater Nashville Metro Area;
>
> (b) The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> (c) Whether such combination or conspiracy violated the federal antitrust laws;

(d) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiff and other members of the Class;

(e) Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on rent for residential units;

(f) The appropriate class-wide measure of damages; and

(g) The nature of appropriate injunctive relief to restore competition in the Greater Nashville Metro Area residential apartment rental market.

187.     Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for residential units managed by cartel members.

188.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

189.     Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

190.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

191.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

192.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.    ANTITRUST INJURY

193.     Defendants' anticompetitive conduct had the following effects, among others:

    (a)     Competition among Defendants has been restrained or eliminated with respect to residential rental units in the Greater Nashville Metro Area;

    (b)     The price of residential rental units in the Greater Nashville Metro Area has been fixed, stabilized, or maintained at artificially high levels; and

    (c)     Individuals have been deprived of free and open competition.

194.     Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for residential rental units in the Greater Nashville Metro Area than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

195.     This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   FRAUDULENT CONCEALMENT

196.   Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix residential rental unit prices in the Greater Nashville Metro Area.

197.   The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data via YieldStar/AI Revenue Management, online meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor or supply restraint communications on documents, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators.  The conspiracy was by its nature self-concealing.

198.   Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and Class members.

199.   The residential rental market is not exempt from antitrust regulation, and thus, before October 15, 2022, when ProPublica published the article "Rent Going Up?  One Company's Algorithm Could Be Why," Plaintiff reasonably considered it to be a competitive industry.  A reasonable person would not have been alerted to begin to investigate the legitimacy of Defendants' rental practices until after that article was published.

200.     Plaintiff exercised reasonable diligence.  Plaintiff and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

201.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## IX.     CLAIMS FOR RELIEF

### COUNT I

### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. §1)

202.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

203.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

204.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units in the Greater Nashville Metro Area and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

205.     Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on rent.

206.     Defendants' anticompetitive conduct had the following effects, among others:

(a) Competition among Defendants has been restrained or eliminated with respect to residential rental units in the Greater Nashville Metro Area;

(b) The price of residential rental units in the Greater Nashville Metro Area has been fixed, stabilized, or maintained at artificially high levels; and

(c) Individuals have been deprived of free and open competition.

207.     This conduct is unlawful under the *per se* standard.  Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

208.     Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## <u>COUNT II</u>
**Conspiracy and Combination in Restraint of Trade in Violation of**
**Tennessee Trade Practices Act (Tenn. Code Ann. §47-25-101, *et. seq.*)**

209.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

210.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee.  All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void.  *See* Tenn. Code, §47-25-101.

211.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in arrangements, contracts, agreements, and/or combinations, with a view to, and which did lessen full and free competition in the market for multifamily rental housing leases, which conspiracy was designed to, and tend to control the price of multifamily rental housing leases in Nashville, in violation of the Tennessee Trade Practices Act (Tenn. Code Ann. §47-25-101).

212.    Defendants competed unfairly and colluded by sharing their confidential, competitive information with one another to fix the price of multifamily apartment leases in Nashville, withholding available units from the rental market, and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §47-25-101, *et. seq.*

213.    Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition of goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for multifamily apartment leases was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for multifamily apartment leases were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for their multifamily apartment leases.

214.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as the artificially inflated leases were sold to Plaintiff and Class Members in Tennessee.

215. Plaintiff and Class Members purchased and paid for their multifamily apartment leases within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of multifamily apartment leases would have been lower, in an amount to be determined.

216. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property and are threatened with further injury.

217. Plaintiff and Class Members were injured with respect to purchases of multifamily rental leases in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that paid on their multifamily apartment leases, damages, equitable relief, and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. §1);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.      The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: May 30, 2023                    */s/ Tricia R. Herzfeld*
_____

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

David R. Scott (*pro hac vice* forthcoming)

Amanda Lawrence (*pro hac vice* forthcoming)
Patrick McGahan (*pro hac vice* forthcoming)
Michael Srodoski (*pro hac vice* forthcoming)
G. Dustin Foster (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com

Patrick J. Coughlin (*pro hac vice* forthcoming)
Carmen A. Medici (*pro hac vice* forthcoming)
Fatima Brizuela (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Kristen Anderson (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
kanderson@scott-scott.com

Thomas J. Undlin (*pro hac vice* forthcoming)
Stacey Slaughter (*pro hac vice* forthcoming)
Geoffrey H. Kozen (*pro hac vice* forthcoming)
J. Austin Hurt (*pro hac vice* forthcoming)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
ahurt@robinskaplan.com

Christian P. Levis (*pro hac vice* forthcoming)
Vincent Briganti (*pro hac vice* forthcoming)
Peter Demato (*pro hac vice* forthcoming)
Radhika Gupta (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke (*pro hac vice* forthcoming)
cburke@koreintillery.com
Walter W. Noss (*pro hac vice* forthcoming)
wnoss@koreintillery.com
Yifan (Kate) Lv (*pro hac vice* forthcoming)
klv@koreintillery.com
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Fax: (314) 241-3525

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (*pro hac vice* forthcoming)
Steven N. Williams (*pro hac vice* forthcoming)
Cadio Zirpoli (*pro hac vice* forthcoming)
Kevin E. Rayhill (*pro hac vice* forthcoming)
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Email:
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin J. Widlanski (*pro hac vice* forthcoming)
bwidlanski@kttlaw.com
Javier A. Lopez (*pro hac vice* forthcoming)
jal@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

Jennifer W. Sprengel (*pro hac vice* forthcoming)
Daniel O. Herrera (*pro hac vice* forthcoming)
Alexander Sweatman (*pro hac vice* forthcoming)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
Tel:  312-782-4880
Fax: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Counsel for Plaintiff*

81